CENTRAL TRUST COMPANY OF DES MOINES, Appellant, v. ARTHUR E. ESTES et al., Appellees.

84

MARCH 13, 1928.

REHEARING DENIED JUNE 26, 1928.

*Nourse & Nourse,* for appellant.

*Wilson & Shaw,* for appellees.

MORLING, J.—The dispute is over plaintiff's claim that the deed is held only as security, defendants contending that, since its original acceptance, it was taken in payment. Defendants rest their case on a writing signed some months after the deed was given, in which the deed is recited as "being made in payment" of the two notes sued upon. This agreement, identified as Exhibit 5, reads as follows:

"This agreement made and entered into as of December 30, 1924, witnesseth, that whereas L. M. Grimes and Jessie Grimes, his wife, and Taylor Grimes and Faye Grimes, his wife, of Des Moines, have this day executed and delivered to the Central Trust Company of Des Moines, a warranty deed to [describing the tract] subject to mortgages now of record, and special taxes, the same being made in payment of two notes, Arthur E. Estes,. No. 9839 and No. 9840 to the Central Trust Company of Des Moines.

"It is hereby agreed by and between the parties hereto that if first parties hereto shall pay to Central Trust Company of Des Moines on or before February 28th, 1926, the sum of ten thousand seven hundred and ninety-three dollars with 6 per cent interest from date the Central Trust Company will convey to the first parties the above described land by good and sufficient deed.

"It being also agreed that so long as first parties pay the interest on mortgages and taxes on said land as they become due the first parties shall be entitled to receive the rents from the same for the year 1925 only. If said interest and taxes are not paid as due, the rents and profits for 1925 shall belong to the Central Trust Company of Des Moines.

"Witness our hands as of December 30th, 1924.

"L. M. Grimes
"Taylor Grimes
"Central Trust Company of Des Moines, Iowa,
"By Wm. C. Harbach, Pres."

The deed is dated December 30, 1924, conveys the land "subject to mortgage aggregating $18,000, and also paving assessment," and contains covenants of warranty. It is signed by the wives of both grantors. The agreement referred to is not signed by the wives. It is admitted on all sides that the making of the agreement was not suggested until March or April, and it was not drawn or signed until May 15, 1925. It is also admitted that the land, instead of being subject to "mortgage aggregating $18,000," as recited, was subject to one mortgage of $15,000 and another mortgage of $6,500, both unpaid. Foreclosure of the first mortgage was pending at the time of the trial of this suit.

The superintendent of banking was appointed as receiver of the Central Trust Company July 29, 1926, but an examiner had been in charge since August 25, 1925, and the plaintiff "was in process of liquidation * * * for about two years prior to that time." (The cause proceeds in the name of the Central Trust Company, with the consent of the receiver.)

It is asserted by both sides that the deed was originally executed and accepted as collateral security, and not as an absolute conveyance. The defendants took up the burden on the question in dispute. L. M. Grimes testified that defendants' dealings in respect to the deed were with Harbach, and that:

"Shortly after this warranty deed was made,—maybe a month or two or three,—I was out to this farm, and the tenant told me that there had been two or three folks come out there looking at the farm, with the view of buying it. * * * I told him it was not for sale, as far as I knew. * * * I went in and talked with Mr. Harbach about it. * * * Mr. Harbach said, 'yes,' they were trying to sell the farm. Then I asked him what they intended to do,—did they consider that they owned the farm? And he said that was his understanding of it, and that they were to go ahead and sell it; and I said then that we ought to get it straightened out. We ought to know what we were up to; whether this is a mortgage or a deed, or what it is. He said he thought that was all right. So we had a talk about it a time or two, and finally,—I can't tell you what was said at the time we talked about it, but then this agreement was written up, and he was to sign it, but he was getting ready to go to Europe, and I was afraid he would get away to Europe before he signed it. I gave it to Louie Kurtz, one day, and told him to catch Harbach at the club, which he did; and he signed the agreement. * * * Since February 28, 1926, I have not made any claim at all to this property, other than I paid the taxes under" agreement pending the litigation.

Over plaintiff's objection, as calling for a conclusion, and varying a written instrument, witness testified:

"Q. As I understand it, the purpose of the execution of Exhibit 5 was to do away with the deed as security, and make this contract supersede the provisions of the deed, Mr. Grimes? A. Well, that was to be the final agreement."

On cross-examination, he testified that by Exhibit 5 the Central Trust Company "would become the absolute owners of it [the land], or were the absolute owners of it, except that we could take it away from them by paying $10,000."

W. C. Harbach testified, over the like objection by defendants:

"Q. Did you ever agree in any manner, or intend to agree, that the property in controversy * * * be taken in payment of that $10,000? A. We took it just as collateral security, for the reason that we did not examine the land. We had no security

prior to this, and we took anything we could get, to keep the account in better shape."

On cross-examination, he said:

"We signed a contract agreeing to let them have the land back, in case they paid us $10,000, and it was merely as collateral security, and we did not want to cut the Grimes out of this property."

With respect to this, the abstract shows motion to strike out the latter part of the answer as not responsive, but does not show the question to which the answer was given.

Exhibit 5 was drawn by L. M. Grimes. The two Estes notes remained in the note case of the plaintiff. The guaranty was kept with the deed and agreement, among the other papers of the plaintiff. Harbach was president "only for a few months."

Defendants' propositions are that:

"1. The uncontradicted testimony shows that the contract entered into in May, 1925, expressed the intention of the parties. 2. No testimony was offered that would justify the court in reforming the instrument. * * * 5. The equities were with defendants."

Defendants also submit, as a proposition of law, "The court will inquire and ascertain the intention of the parties,"—and cite to this *Keeline v. Clark*, 132 Iowa 360, where it is said:

"A court of equity will inquire into the transaction, and, having ascertained the real intention of the parties from all the facts and circumstances, will decree the true character thereof; and it will be held a mortgage if the party asserting it to be so has sustained the burden which the law casts upon him of making proof; otherwise it will be declared what, upon its face, it purports to be, a sale with contract of repurchase."

Defendants also submit the legal propositions, "an absolute conveyance intended as a mortgage may afterwards be converted into an unconditional transfer of title," and "the burden of proof that the deed was a mortgage is upon the party asserting the same." In view of the manner of the submission of the

cause below and here, it is not necessary to set out the pleadings.

The deed was admittedly, when given, an equitable mortgage. The claim that it was converted into an absolute conveyance is rested on the written instrument made and signed more than four months later. There is no other evidence that, when the later writing was signed, in May, 1925, there was any mutual purpose of altering or transforming the effect of the original execution of the deed as it actually existed, on December 30, 1924. The evidence is to the contrary. Instead of drawing what purported to be a new agreement, defendant L. M. Grimes drew one "as of December 30, 1924," reciting the conveyance as "being made in payment" of the two notes. This recital, on the testimony of all the witnesses, is untrue. The purpose on December 30, 1924, was to take the deed as security only. No one testifies to later conversation or transaction in any wise indicating a purpose to change the rights of the parties as they in fact previously existed. Grimes testifies to his conclusion that Exhibit 5 "was to be the final agreement," and to his understanding that "they would become the absolute owners;" while Harbach testifies to his conclusion that "we took" the new contract "just as collateral security." Harbach does say, however, that they did not examine the land. When the agreement was signed, in May, 1925, the wives of the two Grimes had inchoate dower interests in the equity of redemption. They have never become parties to any new agreement. None of the owners of the equity of redemption from the deed of December 30, 1924, have made conveyance thereof. The agreement not only misrecites the arrangement that was actually made, but the deed misstates the amount of incumbrance as $18,000, when it is $3,500 more. The land was not examined. There was no serious deliberation or consultation. It must be that the title had not been examined, and, as Harbach says, they "took anything they could get." There was never any intimation that Estes or Grimes demanded or expected a return or cancellation of the notes or guaranty. Whether the recital of the deed as "being made in payment of the two notes" is contractual or incontestable, see *McNamara v. Estes*, 22 Iowa 246, 259; *Beers v. Broad & Market Nat. Bank,* 102 N. J. Law 5 (131 Atl. 105); *International*

*Tr. Co. v. Palisade L., H. & P. Co.*, 60 Colo. 397 (153 Pac. 1002); 22 Corpus Juris 1233.

The case is submitted on the fact question of what the intention actually was.

Furthermore, there is no evidence that the board of directors was consulted, or that Harbach had any authority to make the alleged agreement. In determining what the purpose of the corporation was, we cannot ignore the legal proposition that Harbach, as president, had no implied authority to take such a relinquishment of the equity of redemption in payment of the notes and guaranty. *Ney v. Eastern Iowa Tel. Co.*, 162 Iowa 525; 7 Corpus Juris 647 *et seq.*; *Wilkin-Hale Bank v. Herstein*, 48 Okla. 628 (149 Pac. 1109); 2 Thompson on Corporations (2d Ed.), Sections 1450 *et seq.*, 1476, 1483, 1607; 14A Corpus Juris 93; 3 Ruling Case Law 440; 7 Ruling Case Law 450 *et seq.*; *Dent v. Peoples Bank*, 118 Ark. 157 (175 S. W. 1154). See *Ida County Sav. Bank v. Johnson*, 156 Iowa 234.

The quarter section of land was incumbered by two mortgages, the principal totaling nearly $135 per acre. The bank was liquidating, and on the verge of a receivership. Harbach gave the matter no serious attention. The agreement, instead of being presented and considered at the office, was sent to Harbach at the club for signature. If he was going to Europe, there were other officers remaining to sign, if it was the agreement of the corporation. We cannot hold that the defendants have relinquished or the corporation has accepted the equity of redemption in payment of the notes or guaranty. Plaintiff is entitled to a personal judgment against the maker of the notes, and against the guarantors for the amount thereof, and is entitled to decree of foreclosure.—*Reversed.*

STEVENS, C. J., and FAVILLE, ALBERT, and WAGNER, JJ., concur.